UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JOE M. MEYERS,

        Petitioner,

           v.                     CAUSE NO. 3:18-CV-910-JD-MGG

WARDEN,

        Respondent.

## OPINION AND ORDER

Joe M. Meyers, a prisoner without a lawyer, filed a habeas corpus petition challenging his 2014 conviction in Hancock County for kidnapping and murder. (ECF 4.) For the reasons stated below, the petition is denied.

## I.    BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Meyers' burden to rebut this presumption with clear and convincing evidence. *Id.* In Meyers' combined direct and post-conviction appeal, the Indiana Court of Appeals set forth the facts underlying his conviction as follows:

> In July of 2014, Meyers was staying at the Always Inn in Indianapolis, Indiana. Ronnie Westbrook (Westbrook), and Amanda Gonzales (Gonzales), who were friends with Meyers, were also staying in the same hotel. Westbrook had rented several rooms at the hotel, and he shared his room with his "on and off" girlfriend, Gonzales. On July 19, 2014, Westbrook spent the night in one of the rooms he had rented with Katrina Miller (Miller). During the night, Westbrook awoke to someone banging on the door. Upon opening the door, he saw Gonzales storming across the parking lot to the room occupied by Meyers. Westbrook closed

the door and went back to bed. Moments later, Gonzales returned and began pounding on the door. This time, Miller answered the door and Gonzales entered the room asking Westbrook what he had been doing in the room with Miller. The two began arguing. The confrontation between Westbrook and Gonzales continued with Westbrook going to the hotel room he shared with Gonzales, but the couple returned to Miller's room, where they were joined by Meyers.

Because Miller did not want to be involved in the conflict between Westbrook and Gonzales, she decided to leave. By that time, it was 6:00 a.m. Meyers offered to give Miller a ride and drop her off at the intersection at "30th and German Church" Road. Gonzales, Miller, and Westbrook all sat in the back seat. As they drove, Westbrook leaned into his seat and Miller rested on him. At some point, Westbrook looked up and saw that they were on "Carroll Road," and that Meyers had driven past Miller's designated stop. This fact caused Westbrook to get into an argument with Meyers, and Westbrook insisted to be let out of the vehicle. According to Westbrook, Meyers pulled over to the side of the road next to a cornfield, where the two argued some more. Westbrook also saw Meyers and Gonzales look at each other suspiciously, and that is when he knew "something wasn't right." Notwithstanding Westbrook's request to be let out, he did not get out of the vehicle at that point, and Meyers drove the vehicle back onto the road. However, as Meyers approached the intersection of 42nd Street and German Church Road, Westbrook again insisted to be let out of the vehicle. According to Westbrook, he did not worry about leaving Miller behind with Meyers and Gonzales because he knew she "always carried a firearm on her." After Westbrook got out of Meyers' vehicle, Meyers, did a "U turn right there in street" and headed in the opposite direction on Carroll Road. Westbrook, who was wearing a GPS–enabled ankle monitor, began walking towards German Church road. Meyers however, drove back to the cornfield on Carroll Road. There, Gonzales gave Meyers a .380 caliber Sig Sauer handgun and she encouraged him to shoot Miller. Meyers shot Miller in the back of the head. The two got inside the vehicle and drove back to the hotel; however, they stopped on the way and picked up Westbrook. The group arrived at the hotel at approximately 6:30 a.m.

On July 24, 2014, Miller's decomposing body was found in a cornfield by two Mormon missionaries who telephoned the police. Subsequent investigations revealed that Miller had been shot in the back of the head with a .380 caliber bullet. There was a shell casing of a Hornady–brand .380 bullet near Miller's body. Miller also showed signs of having been beaten before being shot: she had blunt-force trauma to the

right side of her face and some of her teeth had been knocked out. She also had a contusion on her thigh.

The discovery of Miller's body was announced on the local news. On July 25, 2014, Isadore Webster (Webster) and his girlfriend, Michelle Muse (Muse), who were residents at the Always Inn, went to the police station and informed the police that they had information regarding Miller's murder. Muse informed the police that she knew Miller and that Miller had stayed in the same hotel with different people from time to time. Muse advised the police that either on July 22 or July 23, 2014, Gonzales approached her and asked if she had ever seen a real murder take place. Muse told the police that she did not understand Gonzales' question. Gonzales explained to Muse that Meyers, Westbrook, Miller, and herself got into a vehicle and drove to a cornfield, where Meyers made Miller get down on her knees, and then Meyers shot Miller in the back of the neck. Webster, who was separately interviewed by the police, reiterated Muse's narration. Webster also informed the police that Gonzales and Meyers each carried firearms. Webster added that Gonzales was Westbrook's girlfriend.

Based on the information gathered from Muse and Webster, the police went to the Always Inn, and inquired if Westbrook and Meyers were residents at the hotel. The Always Inn confirmed that Westbrook and Meyers had paid for rooms in advance, and the police obtained the surveillance video from the hotel. The surveillance video substantiated Muse's and Webster's account, and the police began to look for Gonzales, Westbrook, and Meyers. On July 26, 2014, the police obtained search warrants to search the rooms occupied by Gonzales, Westbrook, and Meyers. During the search of Meyers' hotel room, several items were discovered, including six unfired Hornady–brand .380 caliber bullets. On the same day, the police initiated a traffic stop of a green 2003 Ford Expedition driven by Meyers, and he was thereafter arrested. Following a search warrant application, at approximately 4:43 p.m. on the same day, the magistrate issued a search warrant authorizing the search of five vehicles, including Meyers' green 2003 Ford Expedition. A search of the green 2003 Ford Expedition yielded a .40 caliber Smith & Wesson handgun and a 12–gage shotgun. The next day, on July 27, 2014, the officers located and arrested Westbrook and Gonzales.

Following Gonzales' arrest, the Hancock County Police Department received additional evidence about Miller's murder from an inmate housed at the Hancock County Jail with Gonzales. The inmate informed the officers that Gonzales had disclosed to her that Meyers had taken out

the barrel of the gun used to kill Miller and hidden it in a storage unit. Without a specific location of the storage unit, the police began searching "every storage unit" in "the entire east side of Indianapolis" possibly being rented by Meyers. Eventually, the police located a storage unit at the Great Value Storage that had been rented by Meyers. Subsequent to a valid search of Meyers' storage unit, the police found a disassembled .380 caliber Sig Sauer gun. While the barrel of the gun was missing, forensic testing confirmed that the slide of the gun was used to fire the bullet casing found near Miller's body. There was also a recorded phone call from the Hancock County Jail, in which Meyers instructed his wife to dispose [of] some evidence. Detective Trent Smoll (Detective Smoll) of the Hancock Sheriff's Department also received a phone call from Meyers' brother-in-law, informing him that he was in possession of a Hornady–brand .380 caliber ammunition box that belonged to Meyers. That ammunition box was missing seven bullets.

*Meyers v. State*, 94 N.E.3d 362 (Table), 2017 WL 4673753, at *1-*2 (Ind. Ct. App. Oct. 18, 2017) (headnotes and internal citations omitted).

On July 30, 2014, the state charged Meyers with murder and kidnapping. *Id.* at *3. He was arrested and appeared that same day for an initial hearing. *Id.* The court appointed counsel to represent him. *Id.* A few weeks later, Meyers filed a motion asking that counsel be relieved and that he be permitted to proceed *pro se*. *Id.* After a hearing, this motion was granted. *Id.* Prior to trial, Meyers moved to suppress the search warrants leading to the search of his hotel room, vehicle, and storage unit, in addition to items found in those locations. *Id.* Following a hearing, the trial court denied Meyers' motion to suppress the search of the storage unit. *Id.* The court stated that it would rule on the other two motions at trial. *Id.*

The case proceeded to trial, and Meyers again moved to suppress the evidence found in the searches of his hotel room, vehicle, and storage unit. *Id.* The motions were denied. *Id.* Westbrook was called as a witness, and he testified that Gonzales owned a

4

Sig Sauer .380 caliber handgun, and that Meyers confessed to shooting Miller on behalf of Gonzales. *Id.* The state also presented surveillance video from the hotel, depicting Meyers, Gonzales, Westbrook, and Miller leaving the Always Inn, and the group later returning without Miller. *Id.* The state also presented evidence of Meyers' movements through his cell phone records, which placed him near the scene of the shooting. *Id.* At the close of the evidence, the jury found Meyers guilty. *Id.* He was sentenced to 60 years for the murder and 12 years for the kidnapping, along with an additional 15 years for being a habitual offender, for an aggregate sentence of 75 years.[1] *Id.*

Meyers filed a notice of appeal. *Id.* He subsequently moved to remand pursuant to Indiana's *Davis/Hatton* procedure so that he could file a petition for post-conviction relief in the trial court.[2] *Id.* This motion was granted. *Id.* Thereafter, Meyers returned to the trial court and filed a post-conviction petition, primarily claiming ineffective assistance of counsel. *Id.* The trial court denied the petition. *Id.* Meyers then proceeded with a combined appeal. *Id.*

On appeal, Meyers raised the following claims: the search warrants issued in his case were invalid and the evidence recovered from those searches should have been suppressed; the evidence was insufficient to support his convictions; the trial judge

---

[1] The court notes that Gonzales was separately convicted of murder and conspiracy to commit murder and sentenced to an aggregate term of sixty years. *Gonzales v. State*, 59 N.E.3d 1100 (Table), 2016 WL 3745918 (Ind. Ct. App. July 13, 2016).

[2] Indiana's *Davis/Hatton* procedure involves a termination of a direct appeal, upon the appellant's motion, to allow him to file a post-conviction relief petition in the trial court. *Taylor v. State*, 929 N.E.2d 912, 917 n. 1 (Ind. Ct. App. 2010). Once those proceedings are concluded, the appellant then pursues a combined direct and post-conviction appeal. *Id.*

should have recused himself due to bias; he received ineffective assistance from trial counsel; and the judge erred in handling his post-conviction petition. (ECF 20-6.) The Indiana Court of Appeals rejected these arguments, affirmed Meyers' convictions, and affirmed the denial of post-conviction relief. *Meyers*, 2017 WL 4673753, at *4-*15. Meyers sought transfer to the Indiana Supreme Court, arguing that the Indiana Court of Appeals erred in rejecting his claims. (ECF 20-9.) His petition was denied. (ECF 20-4.)

Thereafter, Meyers sought federal habeas relief. His amended petition raises the following claims: (1) the trial court's admission of evidence from his vehicle, motel room, and storage unit violated his rights under the Fourth Amendment; (2) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his Fourth Amendment claim related to the search of his motel room; (3) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his Fourth Amendment claim related to the search of his vehicle; (4) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his Fourth Amendment claim related to the search of his storage unit; (5) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his sufficiency of the evidence claim pertaining to the murder charge; (6) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his sufficiency of the evidence claim pertaining to the kidnapping charge; (7) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his ineffective assistance of counsel claim; and (8) the Indiana Court of Appeals violated his rights by failing to properly adjudicate his claim that the post-conviction court committed procedural errors. (ECF 4 at 5-26.)

II.     ANALYSIS

Meyers' petition is governed by the provisions of the Anti-Terrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336

(1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a

person in custody pursuant to a state court judgment "only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a). The court can grant an application for habeas relief if it meets the

stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

This standard is "difficult to meet" and "highly deferential." *Hoglund v. Neal*, 959

F.3d 819, 832 (7th Cir. 2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "It is

not enough for a petitioner to show the state court's application of federal law was

incorrect; rather, he must show the application was unreasonable, which is a

'substantially higher threshold.'" *Hoglund*, 959 F.3d at 832 (quoting *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007)). "A petitioner must show that the state court's ruling on the

claim being presented in federal court was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for

fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A state court's decision can be reasonable under this standard even if the federal habeas court would have reached a different conclusion. *Id.*

A.  Claims One Through Four

Claims one through four are all different iterations of the same basic claim: That the searches of Meyers' vehicle, motel room, and storage unit violated the Fourth Amendment, and that the evidence obtained in those searches should have been suppressed. (ECF 4 at 5-13.) The respondent argues that all four claims are barred by *Stone v. Powell*, 428 U.S. 465 (1976). The court agrees.

In *Stone*, the U.S. Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. That is because the exclusionary rule, which requires the suppression of evidence obtained in violation of the Fourth Amendment, is not a "personal constitutional right" of the accused; rather, "it is a judicially created means of effectuating the rights secured by the Fourth Amendment." *Brock v. United States*, 573 F.3d 497, 499 (7th Cir. 2009) (internal citation and quotation marks omitted). The rule was intended to deter violations of the Fourth Amendment by "removing the incentive to disregard it," but it has attendant costs, since it "deflects the truth-finding process and often frees the guilty." *Stone*, 428 U.S. at 484, 490. Thus, the rule "has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Id.* at 486-87. In habeas proceedings,

the "contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." *Id*. at 495.

Therefore, federal habeas courts are barred from considering Fourth Amendment claims that were fully and fairly litigated in state court. *Id*.; *Monroe v. Davis*, 712 F.3d 1106, 1114 *(*7th Cir. 2013). A habeas petitioner had a full and fair opportunity to litigate a Fourth Amendment claim if: "(1) he clearly apprised the state court of his Fourth Amendment claim along with the factual basis for that claim; and (2) the state court carefully and thoroughly analyzed the facts, and (3) the court applied the proper constitutional case law to those facts." *Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005). A federal habeas court's task is not to "second-guess the state court on the merits of the petitioner's claim, but rather to assure ourselves that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe*, 712 F.3d at 1114.

Meyers did not respond to the state's *Stone* argument.[3] Moreover, the record reflects that he received a full and fair opportunity to litigate his Fourth Amendment claim in state court. As recounted above, he raised this claim at trial and on appeal. The trial court held a hearing and issued two rulings in connection with his motions. In rejecting the argument on appeal, the Indiana Appellate Court thoroughly analyzed the

---

[3] The court notes that by operation of N.D. IND. L.R. 47-2, Meyers' traverse was due May 12, 2020. None was received by that deadline. Out of an abundance of caution, the court reset the deadline for August 17, 2020. (ECF 24.) That deadline has passed and no traverse has been received.

facts and looked to applicable Fourth Amendment principles to resolve the claims. *See Meyers*, 2017 WL 4673753, at *4-*9. The court separately analyzed and reviewed each search, concluding that probable cause adequately supported the searches and, alternatively, that the evidence obtained from the searches was admissible under the "good faith" exception set forth in *United States v. Leon*, 468 U.S. 897 (1984). *Id.* It is clear that Meyers would like this court to reconsider the evidence and reach a different conclusion, but that is "a path that *Stone* closes." *Hayes v. Battaglia*, 403 F.3d 935, 939 (7th Cir. 2005). Therefore, these claims do not entitle him to federal habeas relief.[4]

B. Claims Five and Six

Claims five and six challenge the sufficiency of the evidence supporting the murder and kidnapping convictions, respectively. (ECF 4 at 15-16.) Under the Due Process Clause of the Fourteenth Amendment, a defendant cannot be convicted unless the state proves all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). When considering a sufficiency of the evidence claim in a federal habeas petition, the court must determine "whether, after viewing the evidence in the light most favorable to the

---

[4] The court notes that within claims one through four, Meyers makes a general reference to his "Fourteenth Amendment due process rights" being violated. (ECF 1 at 9, 11.) Meyers did not exhaust any such claim in state court. *See* 28 U.S.C. § 2254(a). In any event, the court must analyze his claims under the Fourth Amendment, rather than under more general due process principles. *See Albright v. Oliver*, 510 U.S. 266, 274-75 (1994) (holding that Fourteenth Amendment claim could not be maintained where the Fourth Amendment protected the rights at issue, because "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (citation and internal quotation marks omitted)). Notwithstanding the wording he uses, the court understands Meyers to be arguing that the Indiana Court of Appeals erred in resolving his claims, such that he meets the standard for obtaining federal habeas relief under AEDPA. The court has analyzed his claims accordingly.

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). The court's role is limited, and it is not permitted to reweigh the evidence or substitute its judgment for that of the finder-of-fact. *Id.*; *Ford v. Ahitow*, 104 F.3d 926, 938 (7th Cir. 1997). A sufficiency of the evidence claim premised on witness credibility is particularly difficult to prove. *McFowler v. Jaimet*, 349 F.3d 436, 456 (7th Cir. 2003). To find in favor of the petitioner on such a claim, the court must conclude not only that the witness was unreliable as a matter of law, "but that no court could reasonably think otherwise." *Id.* As stated above, this court must presume the facts set forth by the state courts are correct, and it is Meyers' burden to rebut this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under Indiana law, a person commits murder when he or she "knowingly or intentionally kill[s] another human being." IND. CODE § 35–42–1–1(1). In rejecting Meyers' claim that there was insufficient evidence to support his murder conviction, the Indiana Court of Appeals found as follows:

> At Meyers' jury trial, Westbrook testified that Meyers confessed to him that he shot Miller. In addition, there was ample circumstantial evidence linking Meyers to Miller's murder. Near Miller's body, the officers recovered a Hornady .380 shell casing. Fragments from a bullet of the same or similar caliber were found in Miller's skull, and during the search of Meyers' hotel room, the police recovered six unfired Hornady .380 bullets in the nightstand. Meyers brother-in-law contacted Detective Smoll and stated that he was in possession of a Hornady–brand .380 caliber ammunition box that belonged to Meyers—that box was missing seven bullets. Further, a disassembled gun that was used to kill Miller was found in Meyers' storage unit. In addition, the State presented evidence of Meyers calling his wife from jail and instructing her to dispose [of] some evidence. Additionally, the State presented the surveillance video from

Always Inn showing Westbrook, Gonzales, Meyers, and Miller, all leaving in one vehicle on the morning Miller was murdered. Meyers' presence at the scene where Miller was killed was corroborated by his cell phone records.

*Meyers*, 2017 WL 4673753, at *10-*11 (internal alterations omitted). The court found this evidence sufficient to support Meyers' murder conviction. *Id.*

Meyers argues that this determination constituted an unreasonable application of the facts for several reasons: he and his brother-in-law were not in touch during this period, and so the police's account of where they obtained the box of ammunition was not credible; he never actually told his wife to dispose of evidence on the recorded phone call;[5] and his cell phone records only placed him in the general vicinity of the shooting, not directly at the cornfield. In effect, he offers his own explanation or characterization of evidence in the record.[6] But it was for the finder-of-fact to consider this evidence and weigh its probative value. To the extent he is asking the court to reweigh this evidence and make its own determination of guilt or innocence, the court is not permitted to do so. Instead, the court must consider the evidence in the record in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319; *Ford*, 104 F.3d at 939.

---

[5] During the recorded phone call, which was played at trial, Meyers instructed his wife to go to "the place where I went to get the cat food from," get an item he referred to as a "demo" and give it to a friend. (Tr. at 1198, 1214.) Meyers' wife testified that she was not entirely sure what he was talking about, but she thought he might have been talking about his storage unit. (*Id.* at 1198.) She also testified that she understood this friend wanted to buy a gun. (*Id.* at 1200.)

[6] To the extent Meyers argues that no witness ever linked him to the surveillance video at the motel, the record belies this argument. Officer Smoll reviewed the video with the jury during his testimony and specifically identified Meyers' vehicle, as well as the individuals inside he believed to be Meyers, Westbrook, Gonzales, and Miller. (Tr. at 639-40, 1140-44.) The motel attendant also specifically identified Meyers and Westbrook as the individuals approaching the vehicle in still pictures taken from the video. (*Id.* at 942-45.)

Viewed in that light, these were damaging pieces of circumstantial evidence. Moreover, Meyers does not challenge the state court's findings that the murder weapon was found in his storage unit, that the same type of ammunition used in the murder was found in the nightstand in his motel room, or that Westbrook testified that Meyers confessed to shooting Miller. Based on this evidence alone, this court cannot conclude that no reasonable fact-finder would have convicted Meyers of murder.

Meyers also claims that the evidence was insufficient to support the kidnapping charge. To convict Meyers of this charge, the state was required to prove beyond a reasonable doubt that Meyers knowingly or intentionally removed Miller by fraud, enticement, force, or threat of force from one place to another while armed with a deadly weapon. IND. CODE § 35-41-2-4; IND. CODE § 35-42-3-2. Regarding the possession of a deadly weapon, the state pursued an accomplice theory, arguing that Meyers was guilty as an accomplice to Gonzales. *Meyers*, 2017 WL 4673753, at *10-*11. Under Indiana law, four factors are considered in determining whether a defendant aided another in the commission of a crime: (1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose the commission of a crime; and (4) the defendant's course of conduct before, during, and after the occurrence of the crime. *Id.* at *10; *see also Vitek v. State*, 750 N.E.2d 346, 352 (Ind. 2001).

The Indiana Court of Appeals found sufficient evidence to support Meyers' kidnapping conviction, which it summarized as follows:

> Westbrook testified that Miller accepted a ride from Meyers believing that Meyers would drop her off at 30th and German Church Road. Instead of dropping off Miller at her designated stop, Meyers drove Miller to a cornfield off Carroll Road where he eventually killed her. . . . Westbrook's testimony established that Meyers and Gonzales were working together as part of a plan to kill Miller. Specifically, Westbrook testified that when he saw that Meyers had failed to stop at 30th Street and German Church Road, where Miller had been requested to be dropped off, Westbrook saw Meyers and Gonzales look at each other suspiciously, and that is when he knew something wasn't right. After Meyers shot Miller, he reassured Gonzales by stating, "Lil Sis, nothing's going to happen to you." Westbrook additionally testified that Meyers and Gonzales routinely carried guns, and the evidence also supported a reasonable inference that either Meyers or Gonzales had a gun at the time Miller was murdered. Moreover, forensic testing confirmed that the slide of the disassembled .380 caliber Sig Sauer gun recovered from Meyers' storage unit, was used to fire the bullet casing found near Miller's body.

*Meyers*, 2017 WL 4673753, at *10-*11 (internal quotation marks omitted).

Meyers argues that this determination was unreasonable because there was insufficient evidence that he or Gonzales ever restrained Miller from leaving the vehicle. (ECF 4 at 16.) However, the state was not required to prove that Meyers or Gonzales physically restrained Miller. He and Gonzales could also be found guilty of kidnapping if they "removed [Miller] by fraud [or] enticement . . . from one place to another." IND. CODE § 35-41-2-4. On that point, the state presented evidence that Miller wished to leave the motel and that Meyers offered to drive her to a particular location where she wanted to go. However, he did not actually drive her to that location, and instead drove her to a cornfield where she was shot and killed. *Meyers*, 2017 WL 4673753, at *10-*11. Considering this evidence in the light most favorable to the prosecution, it was sufficient to establish that they removed her from one place to another by fraud or enticement.

14

Meyers also argues that there was insufficient evidence that he and Gonzales were working together, or that either of them possessed a firearm. As to whether the two were working together, he suggests that Westbrook's testimony on this point was too equivocal. The trial transcript reflects that Westbrook testified that, when they were in the vehicle, Gonzales was "cussing" and was visibly upset. (Tr. at 1018.) They drove for a while with Miller resting her head on Westbrook. (*Id.*) When Westbrook looked out the car window, he saw they were not at the location where Meyers was supposed to be taking Miller. (*Id.* at 1018-19.) He further testified:

> Amanda and Joe, they looked at each other. Like she was doing something . . .  She was doing something behind the seat. They looked at each other . . . I didn't know where we was  . . . They pulled off the road by a cornfield and they all said some bullshit, man. I was like, man, get me the fuck out of this truck. We was sitting there for a minute, as I calmed down they backed out of where they pulled off the road and back onto the road.

(*Id.* at 1019.) The prosecution then asked, "What did they do that caused you to have that reaction?" (*Id.*) He responded: "I don't know, something not right about the situation. Like I said, when they looked at each other . . . it wasn't no talking or nothing really. Like I said it was just—I don't know just got a bad vibe, something not right about the situation." (*Id.*)

Although Westbrook's testimony was not a model of clarity, it is clear he perceived that Meyers and Gonzales had an unspoken understanding and that they were planning to do something nefarious. The situation made him sufficiently uncomfortable that he demanded to be let out of the car. (*Id.* at 1019.) When he later rejoined the group, Miller was no longer with them. (*Id.* at 1020-21.) Westbrook further

15

testified that Meyers admitted to him that he shot Miller on behalf of Gonzales. (*Id.* at 1023-24.) Westbrook's testimony was that Meyers told him Gonzales was "mad because me and Katrina was in a room together." (*Id.* at 1023.) When they got to the cornfield, however, Gonzales "couldn't do it so she gave the gun to Joe," and he shot Miller. (*Id.*)

There was also ample evidence that either Meyers or Gonzales, or both of them, were carrying firearms in the car. Westbrook testified that both Meyers and Gonzales routinely carried guns. (*Id.* at 1017-18, 1032.) Meyers called his wife as a defense witness, and she, too, testified that Meyers "always had guns." (*Id.* at 1189-90.) During his closing argument, Meyers admitted: "Yes, I did have guns. I had a lot of guns. . . [T]hey was in the truck, they was in the storage unit." (*Id.* at 1249.) Forensic testing confirmed that the gun recovered from Meyers' storage unit was used to fire the bullet casing found near Miller's body. *See Meyers*, 2017 WL 4673753, at *10-*11. Considering this evidence in the light most favorable to the prosecution, it was sufficient to establish that Gonzales and Meyers were working together to kidnap Miller, and that one or both of them possessed a firearm when they were driving to the cornfield.

In summary, Meyers has failed to show that no reasonable factfinder could find him guilty of murder or kidnapping based on the evidence presented. *Jackson*, 443 U.S. at 319. The state court's resolution of this claim was not unreasonable, and therefore the claim is denied.

C. Claim Seven

Meyers next asserts that he received ineffective assistance from his trial counsel. (ECF 4 at 20-21.) Specifically, he argues that the attorney who represented him briefly

16

before trial, Jeffrey D. McLarnon, should have moved to have the trial judge disqualify himself. (*Id.*) Meyers believes disqualification was warranted "because he was the same Judge that found probable cause for Meyers to stand trial . . . and ordered several protection orders against Meyers, and made rulings against Meyers' that put [his] impartiality into question."[7] (*Id.* at 20.)

Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). To prevail on such a claim, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Richter*, 562 U.S. at 105. The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a habeas proceeding: "[T]he question is not whether counsel's actions were reasonable. The question is whether

---

[7] Meyers suggests that the Indiana Court of Appeals mischaracterized his argument when it understood him to argue that "his trial counsel was ineffective for failing to detect an issue of judicial bias . . . which would have necessitated the filing of a motion for change of judge." *Meyers*, 2017 WL 4673753, at *11. The court can discern no error or mischaracterization in this articulation of Meyers' claim, the gist of which is that counsel should have requested that the trial judge recuse himself. The court notes that with respect to the "orders of protection" Meyers mentions, he appears to be referring to pretrial no-contact orders issued by the judge prohibiting Meyers from contacting witnesses or the victim's family members. (*See* Tr. at 12; ECF 20-1 at 3.)

there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Furthermore, the court should "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight, " *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010), and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). An attorney's representation "need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). Rather, "[i]t must merely be reasonably competent." *Id.* Counsel is also afforded significant discretion in selecting a trial strategy based on the information known at the time. *Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011). If the defendant wanted counsel to raise an argument that itself had no merit, an ineffective assistance claim cannot succeed, because "[f]ailure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt

might have been established if counsel had acted differently." *Richter*, 562 U.S. at 111.

"The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112.

Here, the record reflects that McClarnon represented Meyers for only a brief period. Specifically, he was appointed to represent Meyers on July 30, 2014, shortly after Meyers appeared for his initial hearing. (ECF 20-1 at 3.) Two weeks later, on August 15, 2014, Meyers moved to have McClarnon discharged so that he could proceed *pro se*. (*Id*. at 7.) On August 27, 2014, the court held a hearing on Meyers' motion and took the matter under advisement. (*Id*. at 8.) A further hearing was held on September 2, 2014, at which time the court granted Meyers' motion to proceed *pro se*. (*Id*. at 9.)

In rejecting Meyers' claim that counsel was ineffective during his brief representation, the Indiana Court of Appeals cited to *Strickland* and applied well-settled Sixth Amendment principles. *See Meyers*, 2017 WL 4673753, at *11-12. The court concluded that Meyers did not show deficient performance or prejudice in light of the limited period of time McClarnon represented him, in part because the judicial rulings he pointed to occurred later in the case. *Id*. at 12. The court also observed that "mere assertions of adverse rulings by a judge do not establish the requisite showing of bias." *Id.* at *11.

Based on the record, the court cannot conclude that the state court's resolution of Meyers' ineffective assistance claim was unreasonable. As noted by the Indiana Court of Appeals, counsel represented Meyers for only a very brief period—approximately two weeks—before Meyers asked that counsel be removed from the case so that he could represent himself. Several of the rulings Meyers points to in support of his

19

judicial bias claim occurred later in the case, after counsel had already withdrawn.[8] (*See* ECF 20-1.) To the extent any of the judicial rulings occurred at a time when counsel could have asked for recusal, it is well settled that "[a]dverse rulings do not constitute evidence of judicial bias." *Thomas v. Reese*, 787 F.3d 845, 849 (7th Cir. 2015); *see also Liteky v. United States*, 510 U.S. 540, 555 (1994) (observing that adverse judicial rulings "are proper grounds for appeal, not for recusal"). There is no indication a motion for recusal would have had merit based on the grounds identified by Meyers, and counsel cannot be faulted for making a motion that had no merit. *Stone*, 86 F.3d at 717. In light of the record, the state court's rejection of this claim was not unreasonable, and the claim is denied.[9]

D.  Claim Eight

In his final claim, Meyers asserts that the post-conviction court violated Indiana Post-Conviction Rule l(6) by summarily denying his petition without a hearing. (ECF 4 at 21-24.) However, even if Meyers could prove that a violation of state law occurred, it would not entitle him to federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68

---

[8] The record reflects that McClarnon remained in the case as standby counsel. (ECF 20-1 at 9.) To the extent Meyers is claiming that McClarnon was ineffective as standby counsel, this does not state a cognizable constitutional claim. "[A] defendant who exercises his Sixth Amendment right to represent himself does not have a right to standby counsel, let alone effective standby counsel." *United States v. Bodley*, 674 F. App'x. 576, 576-77 (7th Cir. 2017); *see also Simpson v. Battaglia*, 458 F.3d 585, 597 (7th Cir. 2006) ("When standby counsel is appointed, the primary concern is that appointed counsel does too much, so as to abrogate the *Faretta* right to self-representation, not too little. Therefore, the inadequacy of standby counsel's performance, without the defendant's relinquishment of his *Faretta* right, cannot give rise to an ineffective assistance of counsel claim under the Sixth Amendment." (internal citation omitted)).

[9] The court notes that in the state proceedings, Meyers also argued that McClarnon was ineffective for failing to raise an objection at his initial hearing. *See Meyers*, 2017 WL 4673753, at *11. It is unclear if he is trying to reassert that claim in this proceeding, but in any event, the record reflects that McClarnon was appointed after the hearing was over. (ECF 20-1; Tr. at 1-13.)

(1991). To the extent he is attempting to reassert his free-standing judicial bias argument within this claim (as the same judge presided over the trial and the post-conviction proceeding), the Indiana Court of Appeals rejected his judicial bias claim, observing that the adverse judicial rulings Meyers pointed to did not establish improper bias. *Meyers*, 2017 WL 4673753, at *11. For the reasons articulated above, this determination was not unreasonable. *See Liteky*, 510 U.S. at 555; *Thomas*, 787 F.3d at 849.

As a final matter, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). For the reasons fully explained above, Meyers' claims do not entitle him to federal habeas relief. The court finds no basis to conclude that jurists of reason could debate the outcome of the petition or a reason to encourage him to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

III.   CONCLUSION

For the reasons set forth above, the petition (ECF 4) is DENIED, and the petitioner is DENIED a certificate of appealability. The clerk is DIRECTED to close this case.

21

SO ORDERED on August 31, 2020

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT